[No. 1577.]

## Thomas A. McDonald *v.* The State.

1. PRACTICE IN THIS COURT.—Assignment that the court erred in refusing an application for continuance will not be considered by this court when the record brings up neither the application nor a bill of exceptions to the ruling.

2. PRACTICE.—Motion to quash the special venire was based upon the ground that one of the jury commissioners was disqualified, inasmuch as he was a witness in the case, and had employed counsel to prosecute the appellant. But it is shown that he had not employed counsel when he acted as jury commissioner, and at that time had no cause in court to be tried by a jury. *Held,* that the motion was properly overruled.

3. SAME—JURY LAW.—Alleged misconduct of the jury was that, while considering of their verdict, they were permitted to visit and examine the room in which the homicide was committed; and that they read the Penal Code on the subject of murder. But it was not shown that the jury were thereby influenced in arriving at their verdict, and therefore the complaint of misconduct is futile.

4. SAME—CHARGE OF THE COURT.—Having retired to consider of their verdict, the jury returned into open court and in writing asked the following question: "In considering threats made by the person killed, together with the character of the deceased as a dangerous man, and one likely to carry into execution any threat he might make, are the jury to understand that the person killing may be so impelled by fear of personal violence or deadly intent of deceased, by reason of said character and threats, as to justify him (the one killing) to prepare himself with a deadly weapon, and putting himself in the presence of the party killed for the purpose of engaging in a deadly conflict with deceased?" To this question the trial court, in writing, replied: "No." *Held,* correct; and in strict compliance with Article 696 of the Code of Criminal Procedure.

5. SAME.—Evidence being such as to demand only a charge upon murder in the first degree, the appellant cannot be heard to complain that the court charged also upon murder in the second degree, since the charge to that extent, if error at all, was error in his favor. Note also a charge upon self defense, which, not being authorized by the evidence, inured to the benefit of appellant, and hence cannot be complained of by him.

6. FACT CASE—EVIDENCE held sufficient to sustain a conviction for murder in the second degree.

APPEAL from the District Court of Madison. Tried below before the Hon. J. R. Kennard.

The indictment in this case charged the murder of John A. Christmas, in the county of Madison, on the eleventh day of December, 1880. The jury found appellant guilty of murder in the second degree, and assessed his punishment at a term of five years in the penitentiary.

R. Mahorner was the first witness for the State. He testified, in substance, that he met the deceased on the morning of December 11, 1880, at the east side of the court house in Madisonville, where deceased had hitched his horse. Witness asked him what he was going to do about a certain case pending against him for disturbing the peace. This case was pending in the justice's court. He told witness that he was going to pay his fine. Witness and the deceased walked into the sheriff's office together. The deceased remarked there that he wanted to see Seay, the sheriff, and pay his taxes. This was about eleven o'clock. Sheriff Seay was not in, but came to his office after a time. Some conversation ensued, after which the witness left, leaving Seay and the deceased in the office together. While in the sheriff's office, the witness saw the defendant pass the office several times and look in. Deceased was then in defendant's full view. Shortly afterwards Seay left, leaving the deceased alone in the office. Witness was then standing at the south door of the court house, about twenty-five feet from the door of the sheriff's office, talking with Burtis, Judge Schrier and J. D. Imboden. During that time he saw the defendant come hurriedly out of his office, which was directly opposite the sheriff's office, and go directly into the sheriff's office; heard him say, "take that, G—d d—n you, for what you said about me," and immediately heard the report of a pistol, followed, with brief intermission, by three other pistol shots. Witness started to go into the sheriff's office, but, with the other parties named, wheeled and ran around the court house. Defendant ran out of the sheriff's office towards the jail, near which he was caught.

Cross-examined, the witness stated that he may, in the excitement of the moment, have told Judge Viser, in the presence of Imboden, that defendant shot deceased without saying a word.

He could not say that he did or did not. Defendant frequently walked up and down the aisle in front of the sheriff's office, but witness did not know that such practice was customary with him. Witness testified before the examining trial, and recognized the last few lines of his testimony therein, and his signa-

ture as written by himself. Witness was once counsel in this case against defendant, and made an argument in it.

Re-examined, witness stated that he had paid particular attention to the parties, as he had heard that there would probably be a difficulty between them. Witness was not so much interested in that difficulty that such interest would influence his testimony. Witness, although in town pretty much every day, did not see the deceased in town after the election, until the day he was killed.

E. B. Seay testified, for the State, that he was up stairs in the court house when the firing of the pistols occurred at the time the deceased was killed. Witness ran down stairs into his office, and found deceased not quite dead. He sprang over the body and looked in his drawer for his pistol, but did not find it; then looked into the deceased's saddle bags for his pistol, but found none. He then ran out of the office and saw the defendant going in a rather fast trot toward the brick stores. The witness and some others who were in advance of him, followed the defendant, and when the witness had nearly overtaken the defendant, he stopped, threw up his hands and surrendered. On searching him the witness found a five shooting pistol with four barrels recently discharged.

When witness left the deceased in his office (witness was sheriff) a few minutes before the shooting, deceased was standing near the window reading a newspaper, with his saddle bags sitting on the floor to the right of the door. Witness described the location of the furniture in the room, which is not material to this statement. When witness got back after arresting defendant, the deceased was dead and the paper he had been reading was lying under the desk. Witness saw where one ball had struck under the desk, and where another had struck the window. The deceased was struck by three balls, one entering the arm and two the head.

When deceased, who worked on witness's place in the country, came to town, he usually put up at witness's house. Witness was usually in town. He did not see the deceased in town from the day of the election until the day of his death. He came in that day to have a settlement with the witness, and to pay his taxes. Witness saw the defendant pass his office and look in several times, just before the shooting. The deceased was then in full view of the defendant. Witness had employed counsel to assist in the prosecution, because the district attorney had requested

him to do so, and because, the deceased being a stranger, he thought some one ought to see that his killing was properly investigated.

G. S. Yarbrough testified, for the State, that he ran into the sheriff's office from up stairs when he heard the shooting, and found the deceased lying on the floor nearly dead. He was lying with his head near the door; his saddle bags were over his right hand, and his left arm was under his body. Witness saw Seay when he took defendant's pistol. Seay handed it to witness. Four barrels had been freshly discharged. Witness searched the deceased's saddle bags, and under a pair of gauntlet gloves found a six shooter, loaded all round. The inquest was held next day. After that inquest witness and Doctor Johnson looked for the ball which went through the deceased's arm, and, after following deflections and angles indicated by position and signs on the wall, found a six shooter ball.

W. C. Gibbs testified, for the State, that, upon completing the count of votes on the day after the election (he being a judge of the same), he went to his dinner. Passing through the house where he took his dinner, he saw defendant on a bed. He had evidently just awakened. He had been drinking heavily the night before, but appeared perfectly sane, and at that time not under the influence of whisky. He had been a candidate for county judge against R. Mahorner. He called witness to him, and told him that deceased had grossly insulted him, and if he did not retract he would kill him. Witness told him not to talk in that manner.

Dr. Johnson, for the State, testified to the character of the wounds on deceased, one of which, he averred, was necessarily fatal. The State closed.

W. A. Glover testified, for the defense, that he saw the deceased in Huntsville, on December 3, 1880. Deceased said, showing witness a six shooter, and speaking of defendant: "Here are six balls. One of them says McDonald shall not hold a third term." In conversation with defendant, after that, the witness told him: "You are elected now, and you are in danger. You must keep sober." Witness mentioned no names. Deceased was somewhat in liquor when he made the remark quoted to witness at Huntsville.

J. R. Hightower testified, for the defense, that he was standing on the gallery of Brizzolari's saloon when the shooting occurred. Looking toward the east window of the sheriff's office,

he' saw a man pass rapidly in front of the window, moving from north to south. He then heard a noise, which he thought at the time was made by the man striking a box with his foot. The man then passed the window, going toward the door, and two pistol shots followed. Witness supposes, now, that the first noise he heard was a pistol shot. If so, he heard three in all. Witness then saw the defendant come out of the north door of the court house, with his hand up to his breast, and walk around the east side of the court house. He then thought the defendant had been shot.

Mollie Mott, cook at the hotel in the town of Madisonville, testified, for the defense, that, on the day of the election, she saw two men standing before the hotel, cursing and abusing one another. The man called Christmas told defendant that he would kill him. Witness said nothing about this until after she heard Christmas was killed, when she told it in presence of defendant's sister.

John Hunter testified, for the defense, that on the day of the killing, and before it occurred, deceased came by his house to employ him to get up a mule. Witness called him "judge." Deceased cursed, and said: "Don't call me 'judge.' I am go-ing to kill a judge to-day." He abused the defendant, and said that he was the judge he was going to kill. In a subsequent conversation with one Parker, Parker asked witness if he would not swear that deceased told him that he intended to kill defendant. Witness did not answer direct, but did tell him what he now says. Had previously told no one else.

J. D. Imboden testified, for the defense, that, at the time of the shooting, he was in conversation, at the south door of the court house, with Schrier, Mahorner and Burtis. He did not hear a word spoken before the shooting. He heard the first shot, and looked up, but saw no one. Mahorner turned up the aisle, with his hand on the facing, like he was going in, but turned and ran east, with Burtis and Schrier, and witness ran in another direction.

On cross-examination, the witness stated that his hearing was somewhat defective. When Mahorner and others started, he asked Mahorner who shot the deceased. Mahorner replied: "McDonald, d—n him; he shot him without saying a word."

The defense introduced Mahorner's testimony at the examining trial, to show that defendant was in the habit of walking up and down the aisle in front of the sheriff's office. By Viser, W. M.

Imboden and Beauchamp, the defense proved that the deceased was a man of violent temper and dangerous character; one likely to carry into execution any threat he might make; by Glover, that the deceased would carry into execution any threat he made seriously; and, by Beauchamp, that the deceased said that if there had been no interference, the county judgeship would have been made vacant on the election day, at Madisonville.

W. M. Imboden, testifying further for the defense, stated that just before the election, the deceased, in a conversation with him, said that defendant was a "d—d old son of a b——h," and that he, deceased, would kill him, at the same time showing witness a pistol. Deceased said he would mind shooting McDonald no more than shooting a d—d dog. Witness afterwards saw the defendant, and told him to be exceedingly careful about deceased. Defendant asked why, and witness told him that deceased had said enough to convince him that he, deceased, intended to harm him. Defendant seemed very anxious to ascertain what the deceased had said, but witness would not tell him, and only warned him to be exceedingly careful.

N. J. Williams testified, for the defense, that some three years before this trial, the deceased proposed to come to his house to stay all night with him, and, after dark, to go to Ben. Alphin's and kill him, if witness would swear him out. Witness had told defendant of this proposition. Witness was then deputy sheriff. Nothing was done about the proposition. He had no particular reason for telling the defendant. Defendant and deceased were then friendly.

J. F. Reed, for the defense, testified that he heard deceased curse defendant, and heard defendant say that he was unarmed. He thought that he heard deceased cock his pistol at that time.

Ira Wakefield, for the State, in rebuttal, testified that John Hunter's reputation for truth and veracity was very bad.

J. W. Gilbert, in rebuttal, testified, for the State, that he was present at the difficulty in front of the hotel. Deceased did not threaten the defendant. He cursed defendant, and told defendant that he, defendant, had treated him, deceased, badly. Defendant admitted the charge, and said that he was not armed. Deceased, with his hand under his coat, told him to go and arm himself and all his friends. Defendant replied: "Wait until night." Deceased replied that he was no night hawk. Witness was standing close to deceased, and did not hear him cock a

pistol. Witness went home with deceased. *En route*, the deceased wanted to return, saying that he had been hurried off without finishing his business. Witness advised him not to return, as a difficulty would result. He replied: "No, I am done with it, but if McDonald ever attacks me again, I will go through him."

The motion for new trial raised the questions involved in the opinion, and denounced the verdict as against the law and the evidence.

No brief for appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. There is no application for continuance in the record, and no bill of exceptions to the action of the court in overruling any such application; and therefore defendant's first assignment of error, that the court erred in refusing to continue the cause at his instance, cannot be considered.

2. There was no error in refusing to sustain the defendant's motion to quash the special venire. This motion is based upon the ground that E. B. Seay, one of the jury commissioners who selected the juries for the term of the court at which this conviction was had, was a witness in behalf of the State in the prosecution of this cause, and had employed counsel to prosecute said cause in behalf of the State. At the time Seay acted as jury commissioner he had not employed counsel to assist in the prosecution. It was not until the term of the court at which the cause was tried that he employed counsel. We are of the opinion that he was not disqualified to act as jury commissioner. He had no suit in that court which required the intervention of a jury. This cause was not his suit at that time, even if it might be so regarded at the time of its trial, which question it is not necessary that we should determine. (Code Crim. Proc., Art. 352.)

3. It appears from a bill of exceptions that, during the retirement of the jury, when considering of their verdict, they were for a while in the room where the homicide was committed, and examined the holes in the walls of the room, etc., and also read the Penal Code upon the subject of murder. It is not made to appear, however, nor do we think it is at all probable that such was the case, that the jury were in the least degree influenced in

their verdict by these matters. We regard the assignments of error in relation to the supposed misconduct of the jury, as without merit.

4. While the jury were considering of their verdict, they came into open court in a body, and propounded to the court in writing the following question: "In considering threats made by the person killed, together with the character of the deceased as a dangerous man, and one likely to carry into execution any threats he might make, are the jury to understand that the person killing may be so impelled by fear of personal violence or deadly intent of deceased, by reason of said character and threats as to justify. him (the one killing), to prepare himself with a deadly weapon, and putting himself in the presence of the party killed for the purpose of engaging in deadly conflict with deceased ?" To this question the court responded in writing: "No." This action of the jury and court was excepted to by the defendant at the time it occurred, and is assigned as error. We are of the opinion that the proceeding complained of was in strict accordance with the law (Code Crim. Proc., Art. 696), and that the instruction given to the jury by the learned judge in answer to their question, was correct, and was not, as is contended by defendant, a charge upon the weight of evidence.

5. Exceptions were also taken to the charge of the court: 1. Because it failed to present a clear view of the law of homicide. 2. Because it failed clearly to define the law of murder in the second degree. 3. Because it instructed at all upon murder in the second degree, there being no evidence to justify such charge. 4. Because the court charged upon an inculpatory theory not sustained by the evidence, that is, on the theory that defendant sought the difficulty. 5. Because the charge failed to present clearly the law of self defense.

We find, after a very careful scrutiny of the charge, that it presents fully and clearly the law of homicide, as applicable to every phase in this case. It clearly defines and explains the elements of both degrees of murder. That it instructs upon murder in the second degree is an objection which the defendant cannot be heard to urge, because, in view of the evidence in the case, this instruction was favorable to him. We think the court would have been justified under the evidence in confining its charge to murder in the first degree, for every fact necessary to establish that degree of homicide was abundantly proved, and there was no evidence which even tended fairly and reasonably

to reduce the killing to a lower degree. That portion of the charge which instructed the jury upon the theory that defendant sought the difficulty was, we think, fully warranted by the evidence. Upon the law of self defense the charge is sufficient. If there had been no charge upon this subject we should not have held its omission to be error, because there is no evidence in the case which raises that issue. In charging upon self defense at all, the court gave the defendant the benefit of a defense that the evidence, in our opinion, did not entitle him to. We think the charge of the learned judge was most fair and favorable to the defendant, and the errors contained in it are favorable to him.

6. That the verdict of the jury is sustained by the evidence there can be no question. As we have before said, the evidence established murder in the first degree, and that the jury found the defendant guilty of the lower degree of murder, assessing the penalty therefor at the minimum fixed by law, exhibits a leniency on the part of the defendant's triers for which he should be deeply grateful.

The judgment is affirmed.

*Affirmed.*